COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-303-CR

 

 

ALLEN JOHN ALDRICH                                                         APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                OPINION ON REHEARING

 

                                              ------------

Following the issuance of our original opinion,
appellant Allen John Aldrich filed a motion for rehearing requesting that we
reinstate the State=s original plea bargain
offer.  We deny Aldrich=s motion
for rehearing, but we withdraw our opinion and judgment issued November 26,
2008 and substitute the following in their place to explain and clarify why
reinstatement the State=s plea bargain offer is not
proper.








                                           I.
INTRODUCTION

The primary issue we address in this appeal is
whether appellant Allen John Aldrich was denied his constitutional right to
effective assistance of counsel.  Because
we hold that the record before us demonstrates that he was, we reverse the
trial court=s judgment and remand for a new
trial.

                                 II. Factual Background

Aldrich was charged with intoxication
manslaughter.  The evidence showed that
at around 8:30 p.m. on April 8, 2004, at the intersection of North Colony and
Ragan in The Colony, a pickup truck driven by Aldrich struck Kimberly Hudson,
who was crossing the intersection crosswalk in a motorized wheelchair,
accompanied by her husband.  Kimberly was
taken to Parkland Hospital, where she later died. 

Shortly after Officer Chad Springer and Sergeant
Bill Hall arrived at the accident scene, Aldrich=s wife,
Danielle, told Sergeant Hall that she and Aldrich were in the vehicle that had
struck the woman in the wheelchair.  At
first, Aldrich denied that he had been driving the pickup, but he later
admitted to Sergeant Hall that in fact he, not Danielle, had been driving. 








Sergeant Hall detected the odor of alcohol on
Aldrich=s
breath, so he asked Officer James Slack to conduct field sobriety tests.  Officer Slack also noticed the smell of
alcohol on Aldrich=s breath, although Aldrich
denied having consumed any alcohol.  The
field sobriety tests were conducted approximately thirty to forty-five minutes
after the accident.  Aldrich=s
performance on the horizontal gaze nystagmus and walk-and-turn tests indicated
intoxication; his performance on the one-legged-stand test did not.  After observing Aldrich=s
performance on the field sobriety tests, Officer Slack again asked Aldrich if
he had been drinking.  According to
Officer Slack, this time Aldrich admitted that he had consumed three
twelve-ounce beers between 6:30 and 7:00 p.m. that evening but had lied earlier
because he was scared.[1]









Officer Slack reported the results of the field
sobriety tests to Sergeant Hall, who asked Aldrich if he would give a blood
sample.  Aldrich said yes.  Once at the hospital, however, Aldrich
retracted his consent.  Sergeant Hall
then ordered that a blood sample be taken because Aldrich had alcohol on his
breath, had failed two of the field sobriety tests, and had initially lied
about driving and because any alcohol in his blood would not be there by
morning.  A nurse drew a blood sample
between 10:30 and 11:00 p.m., more than two hours after the accident.  The blood sample contained 0.07 grams of
alcohol per 100 milliliters of blood. 
The State elicited retrograde extrapolation expert testimony that a 0.07
result at 11:00 p.m. meant that Aldrich=s blood
alcohol level at 8:30 p.m. would have been between 0.1 and 0.12.  A drug screen performed on Aldrich=s blood
sample did not reveal the presence of any drugs.

According to Aldrich, he drank three beers while
he played frisbee golf between 2:30 p.m. and 6:30 p.m. the day of the
accident.  Four individuals, who were
Aldrich=s
neighbors and friends, testified that they had seen or spoken with Aldrich at
various times throughout the day and evening prior to the 8:30 p.m. accident
and expressed their opinions that Aldrich did not appear intoxicated or to have
lost the normal use of his mental or physical faculties.  Aldrich told Sergeant Hall at the scene that
he did not see the Hudsons because he was blinded by the headlights of oncoming
traffic.

A jury convicted Aldrich of intoxication
manslaughter, and the trial court assessed his punishment, enhanced by a prior
felony conviction for driving while intoxicated, at sixty-two years=
confinement.  This appeal followed. 

                            III.  LEGAL SUFFICIENCY
OF THE EVIDENCE








In his seventh point, Aldrich claims that the
evidence is legally insufficient to support his conviction.  In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007). 
A successful legal sufficiency challenge will result in the rendition of
an acquittal by the reviewing court.  Tibbs
v. Florida, 457 U.S. 31, 41B42, 102
S. Ct. 2211, 2218 (1982).  Accordingly,
we address legal sufficiency rendition points before we address remand
points.  See Nickerson v. State,
69 S.W.3d 661, 668 (Tex. App.CWaco
2002, pet. ref=d).

The statutory elements of intoxication
manslaughter, as modified by the particular allegations in the indictment at
issue, are as follows:

(1) Aldrich

(2) operated a motor vehicle

(3) in a public place

(4) while intoxicated by
not having the normal use of his mental and physical faculties by reason of the
introduction of alcohol into his body

 

(5) and as a result of
the intoxication, caused the death of an individual, namely: Kimberly Sue
Hudson

 

(6) through accident or
mistake, to-wit: by failing to yield the right of way, by failing to maintain a
proper lookout, and by failing to avoid a collision between his vehicle and
Kimberly Sue Hudson, a pedestrian. 

 

See Tex. Penal Code Ann. ' 49.08
(Vernon Supp. 2008); see Auldridge v. State, 228 S.W.3d 258, 260 (Tex.
App.CFort
Worth 2007, pet. ref=d) (setting forth elements of
intoxication manslaughter).








Aldrich testified that he was driving his truck
in a public place, that he struck Kimberly Sue Hudson as she maneuvered her
motorized wheelchair in a crosswalk, and that he had consumed three
twelve-ounce beers earlier that day. 
Based on Aldrich=s blood alcohol level after the
accident, the State=s retrograde extrapolation
experts testified that Aldrich=s blood
alcohol level at the time of the accident would have been between 0.1 and
0.12.  Numerous witnesses testified that
when the accident occurred, it was dusk but not dark; that the street where the
accident occurred was well lit; and that the crosswalk was clearly marked and
visible.  Thus, applying the legal
sufficiency standard of review, that is, viewing all of the evidence in the
light most favorable to the prosecution, we hold that a rational trier of fact
could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson, 443 U.S. at 319,
99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  We overrule Aldrich=s
seventh point.

                            IV.  INEFFECTIVE ASSISTANCE
OF COUNSEL








In his first point, Aldrich complains that he was
denied his constitutional right to effective assistance of counsel because
retained counsel=s performance was so deficient
that no reasonable trial strategy could justify it and because his retained
attorney=s
outrageous conduct was so serious that it undermined the proper functioning of
the adversarial process, deprived him of a fair trial, and prejudiced and harmed
him.  Aldrich raises and presents
thirteen categories of alleged ineffective acts by his counsel during trial,
including that he Afailed to properly interview
witnesses, review evidence, and investigate@; Afailed
to request that the trial court appoint necessary experts despite Appellant=s
indigency@; failed to file proper and
timely motions; misunderstood and misapplied the law; exhibited general
incompetence stemming from problems associated with either mental or physical
infirmity; made inaccurate and incomprehensible statements; alienated the judge
and the prosecutor to the detriment of his client and violated the rules of
professional responsibility; failed to adequately convey the plea offer;
presented harmful evidence with no strategic purpose; presented defensive
theories unsupported by the evidence; failed to make proper objections or ask
proper questions of witnesses; failed to object to the improper reading of the
victim impact statements before punishment was assessed; and failed to offer
any evidence or argument at punishment at all. 
Within each of these thirteen categories, Aldrich points to numerous
specific instances of conduct and specific omissions by his trial counsel.

A.     Standard of Review 








To establish ineffective assistance of counsel,
an appellant must show by a preponderance of the evidence that his counsel=s
representation fell below the standard of prevailing professional norms and
that there is a reasonable probability that, but for counsel=s
deficiency, the result of the trial would have been different.  Strickland v. Washington, 466 U.S.
668, 687, 104 S. Ct. 2052, 2064 (1984); Thompson v. State, 9
S.W.3d 808, 812 (Tex. Crim. App. 1999). 
No distinction exists between the standards of effectiveness for
retained counsel and appointed counsel.  Ex
parte Briggs, 187 S.W.3d 458, 469 (Tex. Crim. App. 2005) (citing Cuyler
v. Sullivan, 446 U.S. 335, 344, 100 S. Ct. 1708, 1716 (1980)).








In evaluating the effectiveness of counsel under
the first prong, we look to the totality of the representation and the
particular circumstances of each case.  Thompson,
9 S.W.3d at 813.  The issue is whether
counsel=s
assistance was reasonable under all the circumstances and prevailing
professional norms at the time of the alleged error.  See Strickland, 466 U.S. at 688B89, 104
S. Ct. at 2065.  Our review of counsel=s
performance must be highly deferential.  Id.  There is a strong presumption that counsel=s
conduct falls within a wide range of reasonable professional assistance, and
the defendant must overcome the presumption. 
Id.  And, under normal circumstances,
the record on direct appeal will not be sufficient to show that counsel=s
representation was so deficient and so lacking as to overcome the presumption
that counsel=s representation was reasonable
and professional.  Bone v. State,
77 S.W.3d 828, 833 (Tex. Crim. App. 2002). 
But in the occasional, rare case, the trial record on direct appeal
alone may present the appellate court with sufficient information to conclude
that no reasonable trial strategy could justify counsel=s
conduct because counsel=s performance falls below an
objective standard of reasonableness as a matter of law, regardless of whether
the record adequately reflects trial counsel=s
subjective reasons for acting as he did. 
Cannon v. State, 252 S.W.3d 342, 349B50 (Tex.
Crim. App. 2008) (reversing conviction based on ineffective assistance of
counsel raised on direct appeal in absence of motion for new trial); Andrews
v. State, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) (same); Robinson v.
State, 16 S.W.3d 808, 809B11 (Tex.
Crim. App. 2000) (holding failure to file motion for new trial does not
procedurally prohibit appellate claim of ineffective assistance of counsel).

Concerning the second Strickland prong, in
giving meaning to the Sixth Amendment=s
requirement that an accused have access to effective assistance of counsel, Awe must
take its purposeCto ensure a fair trialCas the
guide.@  Strickland, 466 U.S. at 686, 104 S.
Ct. at 2064.  The United States Supreme
Court has explained the meaning of a fair trial:








[A] fair trial is one in
which evidence subject to adversarial testing is presented to an impartial
tribunal for resolution of issues defined in advance of the proceeding.  The right to counsel plays a crucial role in
the adversarial system embodied in the Sixth Amendment, since access to counsel=s skill and knowledge is
necessary to accord defendants the Aample opportunity to meet the case of the
prosecution@ to which they are
entitled. . . .  That a person who
happens to be a lawyer is present at trial alongside the accused, however, is
not enough to satisfy the constitutional command.  The Sixth Amendment recognizes the right to
the assistance of counsel because it envisions counsel=s playing a role that is
critical to the ability of the adversarial system to produce just results.  An accused is entitled to be assisted by an
attorney, whether retained or appointed, who plays the role necessary to ensure
that the trial is fair.

 








Id. at 685, 104 S. Ct. at 2063 (citations
omitted).  AThe
benchmark for judging any claim of ineffectiveness must be whether counsel=s
conduct so undermined the proper functioning of the adversarial process that
the trial cannot be relied on as having produced a just result.@  Id. at 686, 104 S. Ct. at 2064.  Prejudice to the applicant from counsel=s
deficient performance is judged by whether counsel=s
conduct so undermined the proper functioning of the adversarial process that
the trial cannot be relied on as having produced a just result.  Ex parte Amezquita, 223 S.W.3d 363, 366
(Tex. Crim. App. 2006).  AAs the
Supreme Court explained, the purpose of the constitutional requirement of
effective counsel is to ensure a fair trial.@  Id. (granting habeas relief on
ineffective assistance grounds because trial counsel failed to investigate
evidence involving the complainant=s cell
phone and trial counsel=s deficient performance so
undermined the proper functioning of the adversarial process that the trial
could not be relied on as having produced a just result); Ex parte Briggs,
187 S.W.3d at 466B67 (granting habeas relief on
ineffective assistance of counsel grounds because trial counsel failed to
investigate or obtain experts for economic reasons, not as trial strategy); accord
Hofman v. Weber, 639 N.W.2d 523, 529 (S.D. 2002) (remanding case for new
trial after holding that trial counsel=s
failure to move to suppress confessions was not within the realm of competence
required of members of the profession); Peebles v. State, 958 S.W.2d
533, 537 (Ark. 1998) (remanding case for new trial after holding that trial
counsel=s
failure to present the victim=s
inconsistent statements to the jury deprived the defendant of a fair trial).

A failure to make a showing under either prong of
the Strickland test defeats a claim of ineffective assistance of
counsel.  Andrews, 159 S.W.3d at
101; Rylander v. State, 101 S.W.3d 107, 110B11 (Tex.
Crim. App. 2003).

B.     First Prong of the Strickland
Analysis








In this case, Aldrich has alleged thirteen
categories of ineffective acts and omissions by his counsel at each stage of
the proceedings, from pretrial to punishment. 
In sixty pages of his ninety-two-page appellate brief, Aldrich presents
and discusses these thirteen categories of errors, making numerous and specific
citations to the record detailing the challenged conduct and explaining how the
challenged conduct not only fell below the standard of prevailing professional
norms but was so outrageous that no competent attorney would have engaged in
it.  Consequently, we begin with a
detailed review of the record, focusing on the portions of the record cited by
Aldrich in connection with the thirteen categories of alleged ineffectiveness.

1.     The
Record Concerning Alleged Ineffective Pretrial Conduct:  Misunderstanding of the Law, Failure to
Adequately Convey Plea Offer, Failure to Investigate, and Failure to Timely
Obtain and Disclose Defense Experts

 

Many of counsel=s
alleged pretrial, as well as trial, errors and omissions are based on counsel=s
legally incorrect interpretation of the United States Supreme Court case of Kyles
v. Whitley, 514 U.S. 419, 115 S. Ct. 1555 (1995).  From the pretrial phase of the case through
the trial of the case, despite repeated correction by both the prosecutor and
the trial court, Aldrich=s counsel persisted in his
legally incorrect assertion that he did not have to do any investigation, any
witness interviews, or make any attempt to obtain discovery because the Kyles
case basically required the State to do all of the investigation in the case
and to turn over to Aldrich all reports, statements, and evidence discovered in
its investigation.

The Kyles issue, which permeated the
entire case, first arose when Aldrich=s
counsel filed a motion that he titled, AMotion
For Discovery/Production.@  The motion states, in pertinent part, that








[i]n K[yl]es v.
Whitley 115 Sup. Ct. 1555, although the final majority opinion was 5/4,
apparently it was 9/0 for the proposition that a prosecutor has a non-delegable
duty, early on in the prosecutions process, to personally interview all persons
who have more than minimal information concerning the case, and to ask such
person the type of questions that could reveal information that an attorney
would recognize could be exculpatory, (as opposed, let=s say, what a policemen
might consider exculpatory), and even if the prosecutor doubts the credibility
of such information, to immediately give such information to the defense for,
among other reasons, the defense may need such information when deciding
whether or not to explore the possibility of a trial as opposed to plea
bargaining. 

 

The relief Aldrich=s
counsel requested at the conclusion of this motion was Athat the
District Attorney be ORDERED to comply with the U.S. Supreme Court mandate set
out in Kyles, and that a deadline be set for such compliance.@ 

The reporter=s record
of the September 9, 2004 pretrial hearing on Aldrich=s motion
for discovery/production begins with Aldrich=s
counsel stating,

I have talked to - - I
forget Jim=s last name, but it=s the guy who is going to
be - - the attorney who is going to be prosecuting this case - - at one time
before the first hearing on the case and asked him if he intended to follow the
mandates of the Supreme Court of the United States in Kyles versus
Whitley.  And he said he was busy and
tied up and he=d talk to me later about
it. 

 

. . .
.

 

I want a court order that
gives him a deadline, because I can never be ready in this case until he
does what he=s supposed to do. 

 

. . .
.

 








I want an order from this
court that says that he must do - - he must talk to these witnesses, he must
ask them the kind of questions that the Supreme Court says he has to ask them,
and he has to reveal to us anything that could even lead to exculpatory
evidence, because he=s saying he=s not going to do it. 

 

. . .
.

 

I said, well, at least
call the police and ask them to talk to us, because we have talked to them and
they say they won=t talk to us unless you
say it=s okay.  He says, no, he wouldn=t do that.

 

THE COURT: I don=t think that you have any
authority that says that he [the prosecutor] has to tell the police officers to
talk to you.

 

DEFENSE COUNSEL: That=s true.  He has the obligation under Kyles
versus Whitley to do it himself and to report back to us if there=s anything exculpatory. 

 

Finally, the prosecutor responded as follows:

What the Kyles case holds
is that there is a distinction between the State=s nondisclosure of known
Brady material versus going out and investigating to uncover Brady
material.  And the State acknowledges
that it does have a duty to obtain exculpatory information, mitigating, or
impeachment evidence that would otherwise be unavailable to the defense, but
the case - - that case, and on its facts, turned upon the bad-faith
nondisclosure of Brady material.

In this case, as we would in any other case, Your Honor, we intend to
comply with the rules of evidence and the case law to turn over any
exculpatory, mitigating, as well as impeachment evidence.  Now, that may not be on [defense counsel=s] time frame in terms of
ordering the State to go out and interview witnesses or police officers, but it
will be done timely and appropriately in this case.

 








DEFENSE COUNSEL: I=m waiting for him to say
when that might be, Your Honor, because I=m going to need at least
90 days after I have this information to get ready for trial.

 

THE COURT: I don=t know that he has to say
when they=re going to do it.

 

DEFENSE COUNSEL: Well,
the Supreme Court says that they should have done it already. [Emphasis added.]

 

After the hearing, the trial court signed a September 21, 2004 order
requiring the State to timely disclose at the earliest feasible opportunity the
existence of evidence tending to negate the guilt of the accused or mitigate
the offense charged or reduce the punishment of the accused. 








At a subsequent pretrial hearing, Aldrich=s
defense counsel again argued that the State was violating Kyles.  Despite the prosecutor=s
representation that the State would be proving intoxication through the
introduction of alcohol (as opposed to drugs) into Aldrich=s body,
defense counsel argued that the prosecutor should have obtained the results of
a drug screen performed on Aldrich=s blood
and should have forwarded it to defense counsel.  Finally, after a lengthy attempt to explain
to defense counsel that, because the State was proceeding under the theory of
intoxication by alcohol, the results of any drug screen performed on Aldrich=s blood
sample would not be exculpatory and would not be subject to production under
the order signed by the trial court, the trial court explicitly told defense
counsel that the case was not set for trial yet and that, if in fact he wanted
the results of the drug screen records, he could subpoena them.  Counsel responded,

Well, when it=s set for trial, then I
guess I could use a trial subpoena, but where am I going to B we=re going to subpoena him
just to come into the Byou know he=s got to be subpoenaed to
trial.

 

THE COURT: You can
subpoena records, though.

 

DEFENSE COUNSEL: Just
tell them to come up here on any day I choose and hand them to him?  The subpoenas say[] they have a right to
produce them in court.  They don=t have to show me diddly
squat.

 

THE COURT: No, sir.  You can subpoena records without that.  You don=t have to have a person present to produce them
to you.

 

. . .
.

 

DEFENSE COUNSEL:  And the subpoena usually says you=re to be at Cwith those records on
such and such a date.  They don=t have to give them to me
at all.  They are just required to be
there.

 

THE COURT: No, sir.  I think you=re completely
mistaken.  You can get those records and
then file them as a business record and those people don=t even have to be here in
order for them to be admissible into evidence.

 

Despite this instruction from the court, when the hearing concluded
some thirty pages later in the record, the trial court again told defense
counsel, ASir, you can get that.  All you have to do is file a subpoena down at
DPS lab and they will send that to you.@  Defense counsel responded, AAll
right.  I shall call them and report back
to you, Your Honor.@ 








Finally, at the third pretrial hearing in this
case, when the trial court called the hearing, defense counsel immediately
began arguing again that the State had failed to comply with Kyles:

A district attorney
simply cannot wait nine months out of a year and say, Well, I haven=t talkedC last time, you remember,
he said, I haven=t talked to any witness
in this case since it began.  And so that
was a good thing.  But he cannot just let
the State use the evidence and develop theories of the case and experiments for
nine months or ten months or 11 months, however long it=s going to be until he
talks to them, and then when he gets all this exculpatory information, thinks
that I=m going to be able to
play catch up in 60 days or something. 
That=s always been my problem
before, as I said.

 

. . .
.

 

[A]nd I told him, [the
prosecutor] on numerous -- I want that -- I want you to obey Kyles vs. Whitley.


 

Again, the trial court attempted to explain to defense counsel that
there were motions he could file and ways he could obtain nonexculpatory
evidence.  The following exchange
occurred:

THE COURT: And all that
[defense counsel=s prior motion for
discovery/production] asks for is exculpatory information.  You have not asked for anything else.  You haven=t asked for any tests, any, you know, how things
were tested, under what conditions they were tested, things of that
nature.  Now, you said your client passed
the blood test?

 

DEFENSE COUNSEL: Yes, he
certainly did.

 

THE COURT: All
right.  Again, don=t you think a motion for
discovery might be proper for you to get what you need?








DEFENSE COUNSEL: Well, I
think after I get the exculpatory information, it certainly is
something --

 

THE COURT: But, if, in
factBlet=s suppose that there=s no exculpatory
information.  How can you get that?
[Emphasis added.] 

 

The hearing concluded, and defense counsel again still had not
performed any investigation or discovery; he was waiting on the State to comply
with his legally incorrect interpretation of Kyles.

At yet another pretrial hearing, defense counsel
still focused on Kyles.  Defense
counsel claimed he wanted to call himself to the stand to testify because 

[w]ell, the only person
that=s really in a position to
testify to these facts about the lack of the court enforcing [the prior order
requiring the State to timely produce exculpatory evidence] about that he was
ordered way back last year to give exculpatory information, and the fact that
you ordered him to give it on the 21st of JanuaryCI have the transcriptsCwould be the lawyer.  The only one who knows about a conversation
with [the prosecutor]. 

 

The trial court permitted defense counsel to offer his own testimony
as a bill, and defense counsel again focused on the State=s
purported lack of compliance with Kyles. 
He testified:

The Court will remember
that after you told him to do it, two pages later in the transcript you ordered
him to turn over exculpatory information then. 
And, of course, the only way that the D.A.=s find out about
exculpatory information is to ask the witnesses as the Supreme Court began in
Brady and later in something and later in the Kyles case that I=ve already given that cite
to, but he would have to talk to these people.








Also in that hearing the Court said let=s get to the heart of the
matter, [the prosecutor], you=re not going to go on the, per se, 08 sign of
intoxication.  You=re going to only go on
the 07; am I correct?  To which [the
prosecutor] said, Absolutely, Your Honor, only the 07.  So that was an indication to us that we were
not going to have to worry about drawing down more money out of my retirement
to get an expert witness on what he has now done.  So we were told that at your direct
questions, his saying absolutely that we weren=t going to have an
attempt at an 08, per se.  Now --

 

THE COURT: No, I don=t
remember it that way.

. . . .

I think what [the prosecutor] meant when he said they were going on
the .07 is that they were not going to do anything regarding any drugs or
anything, just the alcohol part of it; is that not correct?

 

THE PROSECUTOR: Yes, Your Honor.  

On the day Aldrich=s case
was originally called for trial, defense counsel testified on the record in a
narrative form spanning eight pages in the reporter=s
record.  Portions of defense counsel=s
testimony include the following:








I warned the Court that
they would exhaust our resources, exhaust our money and at the last minute come
up and do this. . . .  Now, he didn=t say I=m going on the
alcohol.  He said, Everybody=s saying 07 throughout
this transcript that I have.  So I didn=t draw out more money out
of my retirement to get somebody to show -- to oppose the extrapolation part of
it. . . .  I called the police and I
said, Look, Captain Chris Chandler is telling us the police are going to give
us nothing, but the Court ordered the District Attorney to tell the people that
it was okay to talk to us and we set up the appointment.  They said, Gee, [defense counsel], that=s not the message I
got.  And I said, Well, Mr. Chandler,
what is the message you got?  He said
that he got it from a lady D.A. who said to him, You don=t have to talk to them. .
. .  So then I called back [the
prosecutor] and I said, Well, you=ve proven to me that there is noBI=ll be honest with youBthere=s no court in Denton
County that=s going to enforce [the
September 21, 2004] order.  You can just
remain in culpable ignorance, as long as you don=t ask, then they=re not going to make you
find out and tell me.  So I guess that,
rather than the right way that I=ve always done it, find out the exculpatory stuff
first and look at the D.A.=s file, I guess I=m just going to have to
look at your file first because I=m not going to get anything exculpatory.  [Defense counsel] said, now, I=m so startled about this
answer, but this is really not a quote, but it is doggone near.  [Defense counsel], you=ve hurt my feelings in
this case by saying bad things about me, so for you only, your client is going
to suffer.  I=m going to close the
open-file policy that the District Attorney established in this county, and you=re not going to get it. .
. .  We feel that that should have been
given by the B DWI videotape that we
should have been given a copy, I believe it=s 20 days. 
I believe the law says they got to give us a copy of it 20 days before
trial.

 

THE COURT: If they=re going
to use it.

DEFENSE COUNSEL: No.  Give it to us 20 days before trial.

THE COURT: If they=re going to use it and it
contains exculpatory information.  If it
doesn=t show anything, then
they don=t have to give it to you.

 

And,
also, did you file a motion for discovery?

 

DEFENSE COUNSEL: WellB

THE COURT: Is that a yes or no?

DEFENSE COUNSEL: To
discover exculpatory information, yes, we did.

 

. . . .








THE COURT: Did you file a
motion for discovery of any scientific tests, any type of videotapes, etcetera,
etcetera?

 

DEFENSE COUNSEL: Well,
since it wasn=t until Tuesday of last
week B

 

THE COURT: My question
is, sir, did you file a motion for discovery?

 

DEFENSE COUNSEL:
Yes.  I think that you would consider my
motion filed and ruled on [on September 21, 2004] a motion for discovery, yes.

 

. . .
.

 

THE COURT: Well, I=m looking at this motion
for discovery [that was ruled on on September 21, 2004].

 

DEFENSE COUNSEL: Yeah.

 

THE COURT: And the only
thing that I see in here is that you=re asking for exculpatory information.  You=re not asking for anything specific, just
anything that=s exculpatory.

 

DEFENSE COUNSEL: Right.

 

. . . .

 








DEFENSE COUNSEL: Now
Judge, just so my position is clear, there=s no appellate court that=s ever said that
exculpatory is what the D.A. has.  What
they say is that exculpatory is any information possessed by paramedics, by
police department, by all the witnesses that are considered State witnesses
because their knowledge is imputed to the D.A.  So in order to be exculpatory, that includes
things that would lead to exculpatory, they have to ask.  But what gets changed here is you keep saying
that your vision is, is just what they have. 
They don=t have to ask.  So no wonder [the prosecutor] hearing that,
doesn=t ask.  Now, they can=t say that we admitted BState can=t say we made a good
faith effort to dig out all this exculpatory information so we could turn it
over.  That=s exactly what happened
in Kyles.  If we don=t find out, we don=t have to disclose it,
and that=s re-enforced by the
Court saying they only have to turn over what they have.  That=s not what the appellate courts say at all. 

 

. . .
.

 

THE COURT: Okay.  You=re talking about witnesses?  Have you filed a motion for a witness
list?  I mean, for trial hearing.  Have you done that?

 

DEFENSE COUNSEL: Have I
done it?

 

THE COURT: Yes.  I don=t see it in the file.

 

DEFENSE COUNSEL: I
didn=t know the defense was
required to do that.

 

THE COURT: You think that
the prosecution has to turn over a witness list without a proper motion?

 

DEFENSE COUNSEL: No.  It=s truthful, I=m not sure.  I=m not familiar with all
the local rules.

 

THE COURT: I don=t think it=s a local rule.  [Emphasis added.] 

 








After defense counsel concluded his narrative testimony, the trial
court permitted the prosecutor to cross-examine defense counsel.  The prosecutor established that defense
counsel had not filed a motion for rule 404b notice, had not filed any kind of
discovery motion (other than the one for exculpatory evidence ruled on on
September 21, 2004), had not turned over to the State the names of any experts
the defense might call, and did not know the law concerning the State=s right
to amend an indictment. 

At the conclusion of this hearing, the prosecutor
stated,

Just to put on the record
that the State, based on what we heard today from Defense Counsel, is seriously
worried about [an] ineffective assistance claim.  And we=re afraid of going and trying this case because
of what Defense Counsel has not done, where he=s never filed a 404(b),
and I had to send it to him.  And when I
did, he accused the State of trying to intimidate him.  He has never filed any motions, didn=t even know when the
witness list has to be turned over, didn=t even know when we had an absolute right to turn
overCI mean to amend the
indictment.  And the State, based on his
testimony, has very serious concerns on trying this whole case again, possibly
getting a conviction, and then getting it overturned because of ineffective
assistance, when he didn=t even file a motion
telling us about an expert.  And we=re afraid that on appeal,
that this would beCwhatever would happen
today, would be overturned because of ineffective assistance.  And we just wanted to put that on the
record.  

 

The prosecutor later
stated,

 

I have one quick thing to
put on the record.  I just want for the
record to state that the State had made a plea offer, 20, to the Defense and
they=ve never responded.  So I just wanted to put that on the record.

 

DEFENSE COUNSEL: That=s not accurate, Your
Honor.  He told us that the offer of 20
years, the maximum, would have to be taken up by the 16th or he
would take our reply to be that we rejected it. 
I believe that=s what your letter said.

 

THE PROSECUTOR: Your
Honor, he doesn=t even know what the sentence is.  [Twenty years] is not the maximum.  The maximum here is life.  And that shows that he did getChe did get the plea
offer. 








Likewise, the trial judge
later commented to Aldrich,

 

And what I=m worried about, and I
know this might offend [defense counsel], and the jury panel or no one is
present.  There are some people present
in the court.  That almost per [se], what
I see right now is ineffective assistance of counsel.  And I would be worried that if you were triedCand I don=t want to try this case
twice, and you were convicted, that in all probability, if this case was
appealed on ineffective assistance of counselCand, of course, I don=t know what the Court of
Appeals would say, but just thinking about what they might say, that in all
probability your case would be overturned, and you would have to be tried again
in this matter.

 

Based on concerns for Aldrich=s
rights, even though a jury panel had been waiting all morning for trial to
commence, the State moved for and was granted a continuance of the trial setting.  Defense counsel was specifically told that
the granting of the continuance reset the timetables for him to be able to
timely file any motions he desired. 

Approximately five months later, the trial court
set a status conference in the case. 
Prior to the status conference, defense counsel sent a letter to the
prosecutor and the trial court claiming the following:








Our courts hold that no matter what my client tells me about the facts
in his case, I am compelled to make a thorough investigation of all
facets and law of his case before I discuss the idea of expending
possibly Mr. Aldrich=s entire wealth upon a
trial or if we should consider a plea. 
No lawyer should be compelled to enter into the trial or plea
discussion with his client until he obtains from the prosecutor all the
exculpatory information as he is required by Kyles to produce.  The prosecutor is forbidden, as he has
bragged about doing in this case, to refrain from even talking to any witnesses
for over a year after the occurrence, long after memories have faded.

Especially when clients have little money (Mr. Aldrich is in
bankruptcy), his meager resources should be preserved to hire experts, if
necessary.  The best way, I have found, to
prepare for trial is to get from the District Attorney that which Kyles says he
must give early in the process.  Then,
knowing what facts the State=s witnesses and the defense agrees upon, to
concentrate to develop additional witnesses, expert and fact, to produce
testimony favorable to the defense.  Only
then is the attorney allowed to discuss with a client whether to attempt a
plea or proceed to trial.

 

. . .
. 

 

When I explained that
[the prosecutor] was attempting to force me to commit what I considered
malpractice by forcing my client to choose twenty (20) years or trial before
the case was th[o]roughly investigated by the defense they did not seem
surprised. . . .  The threat of
[the prosecutor] to withdraw his twenty (20) year offer on 06 June 2005 if I do
not commit malpractice has been conveyed to Mr. Aldrich whom I am proud to say
rejects this latest attempt at blackmail. [Emphasis added.] 

 








A few weeks later, the trial court held the
status conference.  Despite the
intervening four- to five-month time interlude, defense counsel still had not
filed any discovery motions, had not filed a motion that a specimen from
Aldrich=s blood
sample be physically turned over to him, and had not requested a witness list
from the State nor turned over his witness list to the State.  Defense counsel fell back to his standard
position, AWell, then the status is that we
still haven=t been given exculpatory matters
by the State.@ 
At this point, the trial court instructed defense counsel to sit down
and to handwrite a request that a specimen of Aldrich=s blood
be turned over to him.  Defense counsel
complied; the handwritten request is contained in the clerk=s
record.  The trial court immediately
signed an order granting the request. 
Defense counsel, upon being informed that the sample was ready for him,
failed to pick it up for over a week until the prosecutor called defense
counsel and asked why he had not picked up the sample.

Another pretrial hearing was held approximately
one month later.  Defense counsel, by
this time, had filed three motions: one motion for production of evidence
favorable to the accused, one motion for reproduction of witness statements or
writings used to refresh the recollection of witnesses, and then a regular
discovery motion.  These three motions
are copied from a form book, replete with blanks and brackets for [caption],
[attorney signature block], and other case-specific items. 








At this hearing, defense counsel indicated that
he had obtained his client=s blood
sample and had it tested and that the results showed a blood alcohol level of
.04;[2]
the focus of defense counsel=s
concern at this hearing was the admissibility of his test results because of
what defense counsel perceived to be chain of custody issues.  The prosecutor explained that defense counsel
did not need to worry about establishing the State=s chain
of custody, he had to establish only his own chain of custodyCwhat he
did with the blood sample from when he picked it up until he returned it.  Defense counsel stated, AIf he
says that=s what the law is, I=m
willing to accept that.  All I=ve got
to do is [prove] my one-hour custody and that would be fine.@  The trial court granted most, if not all, of
the relief sought in defense counsel=s
motions; the prosecutor indicated that most of the items and information sought
had already been gratuitously provided to defense counsel.








A final pretrial conference was held on the
morning of July 25, 2005, the first day of trial.  The trial court had previously ordered the
defense to disclose the names and addresses of all defense experts at least twenty
days before trial.[3]  The week before trial, not twenty days before
trial, defense counsel faxed to the State a document titled, AIn
Response to the State of Texas Request for Information on Expert Witnesses.@  The response listed a ADavid
Taylor@ as an
expert who would testify regarding roadway headlights.[4]  No address, phone number, or curriculum vitae
was provided for ADavid Taylor.@  Nonetheless, the State conducted an internet
search and contacted the person it believed was the defense expert, an accident
reconstructionist from the Carrollton Police Department.  That particular David Taylor said that he had
never been contacted by anyone about the case, and defense counsel stated on
the day of trial that he intended to call a different David Taylor.[5]  The trial court ruled that David Taylor would
not be allowed to testify because defense counsel had failed to provide proper
or timely notice to the State regarding Taylor. 
The response also listed Don Ingle as an accident reconstructionist expert.  The trial court subsequently ruled, however,
that because Ingle=s accident reconstructionist
experience included only taking one short course thirty years ago, he was not
qualified to testify as an accident reconstructionist expert; he did testify as
a fact witness.








On the morning of trial, defense counsel filed a ASupplement
to Defendant=s List of Expert Witnesses.@  The supplement sought to designate a ARichard
E. Sullivan@ as an illumination expert and
attached a report from Sullivan that had been prepared the weekend before trial
started on Monday.  The report documents
the illuminance in the crosswalk at issue, specifically, the limited
illuminance provided in the crosswalk near the center of the four-lane
street.  Defense counsel claimed that he
had just decided to call Sullivan as an expert because the State had tardily
provided the defense exculpatory informationCthe fact
that Sergeant Bill Hall was the officer to whom Aldrich had stated at the scene
that he had been blinded by the lights of oncoming traffic.  But the record reflects that the prosecutor
had gratuitously provided the names of all the involved officers to defense
counsel on January 21, 2005, at a hearing that had occurred six months before
trial commenced.  The trial court ruled
that Sullivan could not testify because this notice was given too late.[6]  The trial court explained, AYou can
bide your time, sir.  You=ve had a
year and a half to prepare this case, so you=ve had
ample opportunity.  And we were ready to
try this case, what, six months ago; and you=ve had
six months more to prepare for it.@ 








The trial court did rule, however, that it would
permit Max Courtney to testify for the defense. 
Defense counsel had provided Courtney=s
curriculum vitae to the State in connection with a motion for continuance that
he had filed about a month earlier.  The
prosecutor indicated, AI know Max Courtney.  I don=t have any
problem at all with Max Courtney.  But
these other people, Your Honor, the people listed here withoutCI haveChe didn=t give
us proper notice.@

Finally, at some point during the trial, defense
counsel subpoenaed Trooper Blair.  The
prosecutor pointed out, AI thought we had a ruling on
that that any of his [Trooper Blair=s]
testimony was irrelevant because Defense Counsel was going to have him testify
to him having an accident, that you can have an accident in the daytime, and
since both this Trooper=s accident was on a highway in
another county, not at this intersection, not in The Colony, not at the exact
same time, anything that would have been relevant with his crash has nothing to
do with the case in chief.@  The trial court ultimately permitted Defense
Counsel to call Trooper Blair; he testified only that it is possible with
different circumstances for a careful driver to nonetheless not see an
approaching pedestrian.








a.      Misunderstanding
of the Law Constituted

Deficient
Performance

 








Looking with great deference to defense counsel=s
perspective at the time, defense counsel=s
misinterpretation of Kyles,[7]
his lack of understanding of basic discovery procedures, and his
misunderstanding of what legally constitutes exculpatory evidence are amply
reflected in the record, and all fall below the objective standard of
reasonableness as a matter of law.  Accord
Andrews, 159 S.W.3d at 100 (holding defense counsel=s
failure to object to the prosecutor=s
misstatement of the law fell below objective standard of reasonableness as a
matter of law); Ex parte Welch, 981 S.W.2d 183, 185 (Tex. Crim. App.
1998) (holding defense counsel=s
misunderstanding of law constituted ineffective assistance of counsel); accord
Ex parte Chandler, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (recognizing
that A[i]gnorance
of well‑defined general laws, statutes and legal propositions is not
excusable and such ignorance may lead to a finding of constitutionally deficient
assistance of counsel@).  Defense counsel was repeatedly told by the
trial court that his interpretation of Kyles was legally incorrect.  Defense counsel nonetheless persisted in his
mistaken interpretation of Kyles and relied upon his mistaken
interpretationCknowing that the trial court
disagreed with itCto make the decision to do
nothing to prepare Aldrich=s
case.  Defense counsel recognized that he
was doing nothing and that he intended to do nothing; he repeatedly claimed on
the record that he would need sixty to ninety days to prepare after the
State completed its investigation and turned over the results of its
investigation to him.[8]  There is no plausible basis in strategy or
tactics for counsel=s misunderstanding of Kyles,
of discovery procedures, or of what constitutes exculpatory evidence.  See Thompson, 9 S.W.3d at 814.  We hold that this conduct satisfies the first
prong of the Strickland test.

b.     Failure
to Adequately Convey Plea Offer

Constituted
Deficient Performance

 








Aldrich argues that trial counsel failed to
adequately convey the twenty-year plea bargain to him.  The record before us contains defense counsel=s letter
rejecting the plea bargain, and it supports Aldrich=s
position.  The letter specifically sets
forth defense counsel=s belief that it would be
unethical and would constitute malpractice for him to even discuss the proposed
plea bargain with Aldrich:

The best way, I have
found, to prepare for trial is to get from the District Attorney that which
Kyles says he must give early in the process.  Then, knowing what facts the State=s witnesses and the
defense agrees upon, to concentrate to develop additional witnesses, expert and
fact, to produce testimony favorable to the defense.  Only then is the attorney allowed to
discuss with a client whether to attempt a plea or proceed to trial. 

 

The letter characterizes the plea offer as Aforcing
my client to choose twenty (20) years or trial before the case was
th[o]roughly investigated by the defense@ and is
dated a mere two months before trial actually started.  [Emphasis added.]  Finally, the letter rejects the plea offer,
stating, AThe threat of [the prosecutor]
to withdraw his twenty (20) year offer on 06 June 2005 if I do not commit
malpractice has been conveyed to Mr. Aldrich whom I am proud to say rejects
this latest attempt at blackmail.@








There is no doubt that an accused is entitled to
effective assistance of counsel during the plea bargaining process.  Ex parte Wilson, 724 S.W.2d 72, 73
(Tex. Crim. App. 1987).  Failure of
defense counsel to inform a criminal defendant of plea offers made by the State
is an omission that falls below an objective standard of professional
reasonableness.  See, e.g., Ex parte
Lemke, 13 S.W.3d 791, 796B97 (Tex.
Crim. App. 2000) (citing numerous cases holding same).  As noted in Ex parte Wilson,

It is important that the
accused be informed of proposals made by the prosecutor; the accused, not the
lawyer, has the right to decide on prosecution proposals, even when a proposal
is one that the lawyer would not approve. 
If the accused's choice on the question of guilty plea is to be an
informed one, the accused must act with full awareness of the alternatives,
including any that arise from proposals made by the prosecutor.

 

724 S.W.2d at 74 (quoting Hanzelka v. State, 682 S.W.2d 385,
387 (Tex. App.CAustin 1984, no pet.)) (emphasis
added).  A defendant=s right
to reasonably effective assistance of counsel during the plea bargaining
process likewise encompasses the requirement that defense counsel communicate
an accepted plea bargain to the State.  See
Randle v. State, 847 S.W.2d 576, 580 (Tex. Crim. App. 1993).








Here, Aldrich=s right
to effective assistance of counsel during the plea bargaining process
encompasses the requirement that defense counsel objectively and adequately
convey a plea offer in a fashion enabling a defendant to make an informed
decision concerning the offer.  See Ex
parte Wilson, 724 S.W.2d at 74.  The
record affirmatively reflects that when Aldrich rejected the plea offerCapproximately
two months before trialCdefense counsel by his own
admission still had not thoroughly investigated the case and, in fact, believed
he was legally and ethically prohibited from even discussing with Aldrich
whether he should attempt a plea or proceed to trial.  Given this belief, defense counsel
characterized the offer as an improper attempt by the State at blackmail and to
force defense counsel to commit malpractice. 
Defense counsel by his own words established that he did not function as
effective counsel during the plea process because he believed that he was
ethically prohibited from discussing the plea offer with his client.  We hold that defense counsel failed to
objectively and adequately convey the State=s
twenty-year plea offer to Aldrich because defense counsel failed to convey the
plea offer in a fashion enabling Aldrich to make an informed decision
concerning the offer and that defense counsel=s
conduct in this regard fell below an objective standard of reasonableness.  Consequently, we hold that this conduct
satisfies the first prong of the Strickland test.

c.      The
Failure to Investigate Constitutes Deficient Performance

 








In judging the defense=s
investigation, as in applying Strickland generally, hindsight is
discounted by pegging adequacy to Acounsel=s
perspective at the time@ investigative decisions are
made.  Rompilla v. Beard, 545 U.S.
374, 381, 125 S. Ct. 2456, 2462 (2005). 
Strategic choices made after thorough investigation of law and facts
relevant to plausible options are virtually unchallengeable, and strategic
choices made after less than complete investigation are reasonable precisely to
the extent that reasonable professional judgments support the limitations on
investigation.  Strickland, 466
U.S. at 690B91, 104 S. Ct. at 2066.  In other words, counsel has a duty to make
reasonable investigations or to make a reasonable decision that makes
particular investigations unnecessary.  Id.

Here, defense counsel was acutely aware that he
needed to investigate Aldrich=s case;
he informed the trial court on multiple occasions that he would need sixty
days, ninety days, or four months to get ready after the State turned over the Aexculpatory
information as [it] is required to do by Kyles.@  And defense counsel explained repeatedly that
by exculpatory he meant Aany information possessed by
paramedics, by police department, by all the witnesses that are considered
State witnesses because their knowledge is imputed to the D.A.@  Defense counsel purposefully decided,
however, to do little (about a year after the accident, defense did go to the
scene and take pictures) or no investigation until after the State had
completed its investigation and had Aturned
over exculpatory information@ per
defense counsel=s interpretation of Kyles.  Based on this entrenched, legally incorrect
interpretation of Kyles, defense counsel admitted in writing (in the
letter rejecting the plea offer) that, on a date only two months before Aldrich=s case
actually went to trial, he had not thoroughly investigated Aldrich=s case.








The record further reflects that defense counsel
failed and refused to request permission to independently test Aldrich=s blood
sample, arguing again that the State had the duty to turn it over to him per Kyles.  Finally, at one of the pretrial hearings
about a month before trial, the frustrated trial court instructed defense
counsel to handwrite a motion for a blood sample he could have tested.  The handwritten request appears in the clerk=s record
and was immediately signed by the trial court.








The record also reflects that Aldrich told
defense counsel that headlights from an oncoming car had blinded him.  Aldrich claimed that he had told an officer
at the scene about the blinding headlights. 
Nonetheless, relying again on his interpretation of KylesCdespite
the fact that the prosecutor had disclosed the names of all involved officers
to defense counsel[9]Cdefense
counsel failed to undertake any investigation to verify this fact or to
ascertain the identity of the particular officer.  Defense counsel claimed on the record that
until a few days before trial, he was unable to learn the identity of this
officer, Sergeant Bill Hall.

The record before us establishes that defense
counsel neither performed a reasonable investigation nor made a reasonable
decision that a particular investigation was unnecessary.  Instead, even after receiving the benefit of
multiple continuances, defense counsel undertook little or no investigationCuntil
just a few weeks before the July 25, 2005 trial settingCbased on
the unreasonable decision that Kyles required the State to perform an
investigation for him and to turn over all Aexculpatory@
matters, which defense counsel defined broadly as anything known by anyone that
might lead to information helpful to Aldrich. 
And the record reflects defense counsel=s
repeated assertions that he needed sixty days, ninety days, or four months to
get ready for trial, not just a few weeks.








We hold that defense counsel=s
failure to conduct a reasonable investigation or to make a reasonable decision
that no investigation was necessary fell below an objective standard of
reasonableness.  There is no plausible
basis in strategy or tactics for defense counsel=s
failure to perform an investigation that he acknowledged was needed and
indicated would take sixty days, ninety days, or four months.  See Strickland, 466 U.S. at 690B91, 104
S. Ct. at 2066; Ex parte Amezquita, 223 S.W.3d at 363, 368; Ex parte
Briggs, 187 S.W.3d at 467. 
Consequently, we hold that this conduct satisfies the first prong of the
Strickland test.

d.     Failure
to Timely Obtain and Disclose Defense Experts

Constituted
Deficient Performance

 

The record affirmatively reflects that although
defense counsel repeatedly recognized the need for defense experts, he did not
timely designate experts for two reasons: 
(1) based on Aldrich=s dire
financial situation, and (2) on his misinterpretation of Kyles.  Aldrich testified via a bill of exceptions
about his current financial situation and bankruptcy.  Specifically, Aldrich testified that he and
his wife were in bankruptcy about the time the accident occurred.  His bankruptcy was discharged a few months
before trial.  Aldrich testified that he
never had enough money and could not borrow enough money to hire lighting
experts.  Immediately following this
trial, the trial court entered a finding of indigence and appointed appellate
counsel for Aldrich.








Defense counsel testified that the Aldriches Adon=t have
the money to investigate this@ and
said that he, likewise, did not have the money to investigate it.  Defense counsel repeatedly told the trial
court that Aldrich was in a dire financial situation, stating, AWe are
broke;@ that
Aldrich had been paying him $100 per month; that defense counsel had been Adrawing
down@ from
his own retirement account to fund Aldrich=s
defense; and that AI=ve
already put out of my pocket a couple of grand in this case.  I=m never
going to get that back because he doesn=t have
any money.@ 
At one pretrial hearing, defense counsel said he needed four months
before a trial setting.  When the court
asked why he needed four months, defense counsel explained, A[F]inancially,
I=m
carrying my client. . . . financially I=ll need
about three or four months= income
from my client and from myself just to get ready. . . . I=ll need
at least 90 days after he [the prosecutor] says there=s all
the exculpatory stuff.@

In fact on the fifth day of trial, defense
counsel explained on the record his reasons for not hiring experts: 

We have known since my
first trip out there [to the location of the accident] that lights were going
to be a problem, but we were shepherding the money, and it is throughout theBall the hearings, judge .
. . .  Mr. Angelino says that I ought to
get my evidence, but we=re waiting to find out
the exculpatory stuff so we=ll know what things to spend ourBour little money on.  Nobody doubts that the Defendant is broke in
this trial and so I said, [g]ive me the exculpatory suff and thenBand I even said and then
we=ll know how to shepherd
our money and see what experts we could afford.

 








Although the accident occurred in April 2004 and
the trial court had ordered the defense to file its list of expert witnesses
twenty days before the July 25, 2005 trial setting, the record reflects that
Aldrich did not designate any experts until a few days before trial (except Max
Courtney whom the State agreed they knew of via a motion for continuance) and
did not designate a lighting expertCRichard
SullivanCuntil
the morning of trial.  Ultimately, the
trial court excluded the expert testimony (some testified as fact witnesses) of
all experts listed by defense counsel, except Max Courtney.








At the pretrial hearings, defense counsel
repeatedly indicated his intent to timely retain experts.  But defense counsel=s
failure to timely retain experts, as explained in his own words during trialCin
addition to a lack of financial resourcesCwas
based on defense counsel=s decision to not hire any
experts until after the State had turned over Aexculpatory@
information as defense counsel believed the State was required to do under Kyles.  When it became clear that Aldrich was
bankrupt and could not pay for or borrow money to pay for experts and when it
became clear that the trial court did not share defense counsel=s
legally incorrect view of the State=s
obligations under Kyles, a reasonably competent attorney would have
several options, including to withdraw from the case, explaining to the court
that Aldrich was now indigent; to prove that indigency; and to request
appointment of counsel or to remain as counsel with the payment of a reduced
fee but request investigatory and expert witness fees from the trial court for
a now‑indigent client.  See Ex
parte Briggs, 187 S.W.3d at 468B69.  Here, defense counsel=s
failure to timely designate experts was not a strategic decision, it was an
economic decision and a decision based on a legally incorrect interpretation of
a United States Supreme Court decision.  See
id. at 467 (recognizing record reflected defense counsel=s
failure to consult with experts was not a strategic decision but an economic
one).  We hold that defense counsel=s
failure to timely designate experts or to make a reasoned decision that no
experts were necessaryCdefense counsel evidently
believed experts were necessary because he did attempt to designate experts,
but his designation was untimelyCfell
below an objective standard of reasonableness. 
See id.  Consequently, we
hold that this conduct satisfies the first prong of the Strickland test.

2.     Conduct During the Guilt-Innocence Phase of
Trial

Aldrich complains that his trial counsel
continued to provide ineffective assistance throughout the guilt-innocence
phase of trial.  He argues that trial
counsel presented theories not supported by the evidence, had physical or
mental infirmities that prevented effective representation, alienated the
prosecutor and the trial court, misunderstood and misapplied the law, failed to
properly question witnesses or to make objections, and made inaccurate
statements throughout trial. 
Furthermore, Aldrich claims that defense counsel was ineffective because
he presented harmful evidence to the jury through Aldrich=s own
testimony.








a.      Presentation
of Defensive Theories Not Supported by the Evidence Constituted Deficient
Performance

 

Defense counsel=s
defensive theory of the case was that Mrs. Hudson committed suicide, alone or
assisted by Mr. Hudson; that Mr. Hudson murdered Mrs. Hudson; or that Mrs.
Hudson was at fault for failing to yield the right-of-way (defense counsel
argued that because Mrs. Hudson was in a motorized wheelchair, not on foot, she
was considered a vehicle instead of a pedestrian and should have yielded the
right-of-way).  He explained in opening
statements,

Now, I know at this time
you must be thinking, wow, this sounds like a suicide or an assisted suicide or
maybe even a homicide on the part of Mr. Hudson.  That=s up to you to determine from the evidence that
you hear.

 

. . . .

But you will know, and I
will suggest to you at the end, that people have been tried for murder with a
lot less motives than Mr. Hudson [the decedent=s husband, who was
walking slightly behind her motorized wheel chair when she was hit] had, and
people have committed suicide for a lot less motives than this woman had.  That=s going to be the facts. 

 

Counsel=s bizarre defensive theories of
the case permeated the entire trial of the case.








Defense counsel repeatedly attempted,
unsuccessfully, to elicit testimony from witnesses to support these
theories.  For example, Sergeant Bill
Hall testified that he was a patrol sergeant with The Colony when this accident
occurred.  Defense counsel asked Sergeant
Hall the following:

Q.  The thing that she was riding in had four
wheels?

 

A.  Yes, sir, I believe it would have.

 

Q.  She was
not afoot.  She was riding and it was
propelled by an electric motor, was it not?

A.  Yes, sir.

 

Q.  And is that B do you know that that=s the definition of a
motor vehicle?

 

A.  A motor vehicleB

 

 . . . .

 

Q. Well, let me ask you
this.  Did you believe in your initial
investigation that theBMr. Hudson and Mrs.
Hudson had made a left turn and started walking across the crosswalk, that they
would have seen the oncomingBthis oncoming traffic, the one that before and
during and after my client wasBthat ultimately hit her, that they deliberately
made a left-hand turn to walk across the place where they knew that these cars
were going to come?  Did you realize that
the night you were out there?

 

A.  Do I believe they deliberately stepped in
front of your client?

 

Q.  That=s for the jury to decide.  I=m just asking you, did itBin your investigation as
the senior officer out there, people with long debilitating injuries, sometimes
they commit suicide, don=t they?

 

A.  In Texas, the people in the crosswalk have
the right-of-way.

 

Q.  Well, that=s the wrong law, but if that=s what you believe, you=re incorrect.  








. . . .

Q.  All right. 
Now, did you, taking in the scene, the lighting, the ability to see a
person that was coming as the Hudsons were, to see oncoming traffic, the
realization that they walked right in front of this oncoming car, did you make
sure and say, Hey, be sure to question Mr. Hudson about why he did such a
thing?  Did you mention, suggest, gosh,
this guy had the opportunity, looks like he just walked her out there in front
of the cars.  Did anything like that
happen?

 

[PROSECUTOR]: Your honor, that=s an
improper question.  There=s no
evidence at all that Mr. Hudson did anything by walking somebody out into the
crosswalk.  I=m going
to object to an improper question and assuming facts not in evidence. 

These questions are merely two of a large number of questions defense
counsel attempted to ask witnesses concerning the strange defensive theories he
posited.  The trial court routinely
sustained the State=s assuming-facts-not-in-evidence
objections to these type of questions.

During final arguments, defense counsel continued
to urge these defenses.  He argued, ABut we
submit that the reason that Ms. Hudson is not here is her fault and nobody else=s.@  He continued,

Mrs. Hudson and Mr.
Hudson came down the street that night; that this long-suffering woman who had
nothing but a more miserable existenceBshe might have been happy in a way, but she was
getting worse.  She had been bound in a
wheel chair for, I think they said three years; that she couldn=t even walk any
more.  And all of us, in our common
knowledge, know that some people say why stick around.  I=ve had a good life.  I=ve had a good marriage.  It=s just going to be a drag, and I=m going to cause burden
and heart break to those I love.








 

[PROSECUTOR]: Objection,
Your Honor, arguing outside the facts of the case.

 

[THE COURT]: I=ll sustain the objection.


 

During defense counsel=s
closing argument, the trial court sustained eight objections by the State that
defense counsel, by bringing up these defenses, was arguing outside the record.

The prosecutor summed it up in his rebuttal:  

Now, let=s also talk about what
Defense Counsel said because, remember, whatever he said is not evidence.  It doesn=t matter what he thinks.  It doesn=t matter at all. 
Let=s go to the facts, the
facts of this.  This is a simple case,
even though you=ve heard a bunch of stuff
that typically has nothing to do with this. 
This is a very, very simple case. 
His client got intoxicated, ran over a lady in a crosswalk in a
wheelchair, killed her, never hit his brakes before he hit her, never hit his
brakes after he hit her, did not stop. 
That=s the facts of this
case.  Now whatever you wantCis that preposterous that
he=s trying to say she wasn=t a pedestrian?  Is that what they=re hanging their whole
case on?  Does that make you sick?  Or that she committed suicide.  You look at that man.  Is that someone who helped his wife commit
suicide or murder, as he said in opening statement?  Is that not crazy?  Is that not sickening? 

 








The record supports none of the three mentioned
defenses:  Mrs. Hudson committed suicide,
either alone or assisted by Mr. Hudson; that Mr. Hudson murdered Mrs. Hudson;
or that Mrs. Hudson was at fault for failing to yield the right-of-wayCbecause
she was in a motorized wheelchair. 
Defense counsel=s persistence in raising these
defenses from opening statement through closing argument over the State=s
repeatedly sustained outside-the-evidence objections fell below an objective
standard of reasonableness. 
Consequently, we hold that this conduct satisfies the first prong of the
Strickland test.

b.     Record
Does Not Establish that Defense Counsel=s Physical and Mental
Infirmities Themselves Constituted Deficient Performance

 








During a pretrial hearing, defense counsel asked
the trial court if he could sit down and told the court, AI have
an emergency supply of oxygen and will try not to do that in front of the jury.@  Seven days before the second trial setting,
defense counsel filed a motion for continuance alleging that Athis 72
year old lawyer has had failing hearing ability for over a year, and for no
apparent reason both hearing aids ceased to operate two weeks ago.@  The trial court granted a continuance.  Approximately a month later, defense counsel
began his voir dire with the statement, ANow you=re going
to hear the other end of the spectrum.  I=m not
full of vim, vigor and vitality like [the prosecutor] is.  I=ll be 73
my next birthday.  I=ve only
got one lung.  So the reason I=m
standing back here, in the back, if my voice drops because I am out of air, if
you=ll just
raise your hand.@ 
One day of the trial, after frequently asking the court, counsel, and
witnesses to repeat themselves, defense counsel told the court,@If the
Court=s
interested, I left my hearing aids in my ashtray of the car that I rode down
here in.  I forgot to bring them
upstairs.@ 
At still another point, defense counsel acknowledged that a witness
might be having a hard time hearing defense counsel=s
questions because AI might run out of breath.@

The record is peppered with instances in which
the jury, the court reporter, the trial court, and the witnesses could not hear
defense counsel and instances in which defense counsel could not hear the
person speaking.[10]  During closing argument, apparently in
recognition of his deteriorating physical state,  defense counsel told the jury, A[Y]ou
know, this is probably the last big case I=ll ever
try.@ 








The record also reflects that defense counsel
repeatedly became confused, even once asking the trial court to remind him as
to what a particular witness was supposed to testify to in his bill of
exceptions.  Defense counsel could not
remember why he had asked the trial court for permission to make a bill of
exceptions and when the witness was brought back, counsel said, AI=m trying
to remember what I was doing.@  During the charge conference, defense counsel
cited a 1958 civil case to the trial court and explained that he may not have
Shepardized it because Amy partner just had a baby.  She went out. 
I=ve done
the very best I can since the 17th of December, and I work Saturdays
and Sundays and it=s difficult for me to keep up,
as you well might imagine.@








Although the record supports the conclusions that
defense counsel was hard of hearing, that defense counsel=s speech
was difficult to hear, and that defense counsel became confused at points
during the trial, these facts in and of themselves do not constitute deficient
performance.  Compare Cannon, 252
S.W.3d at 349B50 (holding defense counsel=s
behavior as a wholeCdoing nothing because he was
unprepared to go forwardCconstituted ineffective
assistance of counsel), with Moore v. State, 227 S.W.3d 421, 422, 427
(Tex. App.CTexarkana 2007, pet. ref=d)
(holding defense counsel=s behavior in allegedly falling
asleep during prosecutor=s cross-examination of defendant
did not constitute ineffective assistance of counsel).  The record reflects that defense counsel
typically asked the witnesses or the trial court to repeat themselves if he was
unable to hear; that the witnesses, trial court, jury, and court reporter asked
defense counsel to speak up when they could not hear him; and that the trial
court reoriented defense counsel when he expressed confusion.  Under these circumstances, we cannot hold
that defense counsel=s physical infirmities or
episodes of mental confusion in and of themselves constitute deficient
performance.  This challenged conduct
does not meet the first prong of Strickland.

c.      Record
Does Not Establish that Defense Counsel=s Alienation of the
Prosecutor and the Trial Court Constituted Deficient Performance

 

The record reflects that defense counsel
alienated the prosecutor and the trial court throughout trial, usually by
arguing that the prosecutor was not complying with, and that the trial court
was not enforcing, the mandates of Kyles.  Defense counsel repeatedly made sidebar
comments, oftentimes about the prosecutor, and frequently argued with the trial
court.  But we have found no authority
for the proposition that defense counsel=s
acerbic and audacious trial style rendered his performance deficient.  Although Aldrich is correct that the record
affirmatively demonstrates defense counsel=s
repeated alienation of the prosecutor and the trial court, we cannot hold that
this conduct meets the first prong of Strickland.[11]








d.     Continued
Misunderstanding of the Law Constituted Deficient Performance

 

In his opening statement, defense counsel again
defaulted to his Kyles position; he told the jury that

[t]he State has an
obligation to look at the case as a whole, to discover what=s good for them and what=s good for us, to let us
know what=s good for us because at
the end of the case you=re going to realize that
they had several billion dollars= worth of equipment and facilities that allowed
them to fully investigate this case.  And
you=ll also find out that the
Defendant was in bankruptcy, so we=re not playing on an even playing field.  And because of that, they have to find out
things that will help us and tell us about it. 
That=s the law.

 








Finally, on the third day of trial, the trial court indicated that he
did not want to hear anything else about Kyles.  But defense counsel continued to bring it up,
stating, AI don=t have
to have my discovery like you would do it or like you wish or the
Prosecutor.  I can rely on the Supreme
Court decisions, which I did do, pretty carefully, Judge . . . .  And that=s all
that=s
required by the case that I=m not
supposed to mention in front of you [i.e. Kyles].@  Thus, defense counsel persisted in his
misinterpretation of Kyles, even after the trial court had repeatedly
explained his misunderstanding and had asked him not to mention Kyles
again.








Other instances demonstrated counsel=s misunderstanding
of the rules of evidence.  At one point
during trial, defense counsel urged the trial court to admit letters to rebut
some testimony by a State=s witness based on the rule of
optional completeness.  When the trial
court asked whether the rule of optional completeness referred only to written
documents, defense counsel responded, ANo, it
does not.@ 
See Tex. R. Evid. 107.  At
another point during trial, defense counsel attempted to impeach one witness
with a report generated by a different witness. 
See Tex. R. Evid. 613.  At
still another point, trial counsel asked permission to take Officer Morton on
voir dire under ADaubert-Kelly@ but
then proceeded to ask the witness factual questions having nothing to do with
his qualifications or his expert testimony. 
See Tex. R. Evid. 702.

We hold that defense counsel=s
continued misunderstanding of Kyles and his misinterpretation of the
rules of evidence fell below an objective standard of reasonableness.  Even giving a heavy measure of deference to
defense counsel=s conduct, no plausible strategy
exists for counsel=s continued misunderstanding of
the law and of the rules of evidence.  See,
e.g., Ex parte Welch, 981 S.W.2d at 185. 
Consequently, we hold that this conduct satisfies the first prong of the
Strickland test. 

e.      Failure
to Properly Question Witnesses Constituted Deficient Performance

 








The record reflects that defense counsel had
great difficulty questioning witnesses. 
He repeatedly made sidebar comments during his questioning.  The trial court repeatedly warned defense
counsel not to make sidebar comments. 
Finally, on the fourth day of trial, the trial court sustained another
of the State=s objections to defense counsel=s
sidebar remarks and then warned counsel, A[O]ne
more time, no sidebar comments.@  After sustaining still more objections by the
State to defense counsel=s sidebar comments, the trial
court warned defense counsel, AI=ll tell
you what, the next time you make a sidebar comment, I am going to hold you in
contempt of Court, over and out; do you understand that?@  After sustaining yet another objection by the
State to defense counsel=s sidebar comments, the trial
court explained,

I believe that I=ve indicated to you
several times over the past six days now that you were on the verge of
contempt, but you continue to make sidebar comments, and I find that very
offensive.  And I think this morning you
went well beyond what you should have.  I
believe the State had to at least twice object to your sidebar comments.  And what I=m going to do is I=m going to hold you in
contempt of court, and I=m going to sentence you
to three days in the Denton County jail and fine you $500.  But the sentence will not take place until
after this trial is over. 

 

At one point in the record, earlier during the trial, defense counsel
argued with the trial court over what exactly constituted a sidebar comment,
and the record could be construed as demonstrating that defense counsel did not
understand what constituted a sidebar comment. 

Additionally, during his efforts to question
witnesses, defense counsel repeatedly interjected his own testimony into his
questioning.  The trial court sustained
over thirty objections by the prosecutors that defense counsel was testifying.

Defense counsel also repeatedly askedCover
eighteen timesCthat the jury be removed so that
he could question various witnesses outside the jury=s
presence.  The patient trial court
typically granted defense counsel=s
request.  For example, during the
testimony of a fact witness, the following occurred:








[DEFENSE COUNSEL]: I
object and ask that the jury be removed. 
If I=m hearing right, did you
have a conversation with me before.

 

[THE COURT]: Okay.  Verney, take the jury out.

 

[THE BAILIFF]: All rise
for the jury.

 

(Jury out)

 

[THE COURT]: Let the
record reflect that the jury is not now present.

State, present and ready?

 

[PROSECUTOR]: Yes, Your
Honor.

 

[THE COURT]: Defense,
present and ready?

 

[DEFENSE COUNSEL]: I
would like toC

 

[THE COURT]: Is the
Defense present and ready?

 

[DEFENSE COUNSEL]: Excuse
me.  Yes, and I would like to do
something, if I may, since the appellate court teaches us when somethingCsight happens, that=s not reflected in the
record, we could read it into the record. 
I would like the record to reflect that the District Attorney pointed
her finger down in the loop at the end of the drive and says, Do you remember
when you were talking to me before, you said, and pointed her finger down
there.  I object to that.  If the D.A. says that she wasn=t doing that then I
certainly want to give her an opportunity to deny it, but in the absence of
denial, I object to what=s occurring.

 

[PROSECUTOR]: I don=t hear a legal objection,
your Honor.

 

[THE COURT]: I don=t hear a legal objection.

 

[DEFENSE COUNSEL]: I
object she=s leading and suggestive
to the witness contrary to what she just said. 
That=s my objection.

 








[THE COURT]: Okay.  We didn=t need to take the jury out for a leading
objection.

 

[DEFENSE COUNSEL]: But I
did need the jury to be absent because it=s requiredCso I can read in the record what I saw
happening.  The Court says that=s supposed to be outside
the presence of the jury.

 

[THE COURT]: All
right.  Don=t lead the witness.

 

[PROSECUTOR]: Your Honor,
I=m impeaching the
witness.  I=m allowed to impeach my
own witness as to the statement she=s made before.

 

[THE COURT]: Okay.

 

[DEFENSE COUNSEL]: But
the District Attorney has made herself a witness in the case now.  That=s my opinion.

 

[THE COURT]: Well, be
that as it may, it=s not my opinion.  Bring the jury back in. 

 

At one point, defense counsel improperly
attempted to impeach a witnessCMr.
HudsonCwith
what defense counsel believed to be a prior inconsistent statement.  At the conclusion of the testimony that day,
the following colloquy occurred:

[THE COURT]: What other
matters do you have?

 

[DEFENSE COUNSEL]: Judge,
I have here a statement from Donald Hudson that I believe contains prior
inconsistent statements to his testimony.

 

[THE COURT]: Okay.

 








[DEFENSE COUNSEL]: And
that=s what I was asking him
about, have you ever said so and so.  She
[the prosecutor] would object and the Court sustained the objection.

 

[THE COURT]: That=s correct.  I don=t think you were impeaching him properly.  There=s a way to do it and a way not to do it.  You weren=t doing it correctly.

 

In addition to generally challenging defense
counsel=s
competency in questioning witnesses, Aldrich also claims that defense counsel
failed to properly attack the relevance and admissibility of retrograde
extrapolation and failed to cross-examine the State=s
witnesses about retrograde extrapolation. 
We agree with the State, however, that the record does not establish the
absence of any plausible strategy or tactic exists for this particular claim of
alleged deficient performance.  As
pointed out by the State, defense counsel could have reasoned that a question
to the State=s retrograde extrapolation
witness based on the defense=s
contention that Aldrich consumed three beers between 2:30 and 6:00 p.m. could
have produced a damaging answer, i.e., that a blood test showing .07 at 11:00
p.m. could not be achieved if Aldrich had consumed only three beers between
2:30 and 6:00 p.m.








And defense counsel successfully elicited
testimony from Max Courtney that the degradation of the alcohol in Aldrich=s blood
from a .07 to a .04, which the State posited occurred during the time between
when the blood was drawn and the time when it was tested by Aldrich, would not
be typical.  The record as a whole,
however, establishes that defense counsel experienced great difficulty in
questioning the witness without making sidebar comments or interjecting his own
testimony through the questions he asked. 
Defense counsel=s conduct in continuing to make
sidebar comments to the point that he was held in contempt and his conduct in
continuing to interject his testimony into the case through his questioning
fell below an objective standard of reasonableness.  No reasonable or plausible trial strategy
exists for counsel=s continued, wide-ranging
sidebar comments or for his repeated improper interjection of his own testimony
into his questions.  Consequently, we
hold that this conduct satisfies the first prong of the Strickland test.

f.      Inaccurate
Factual Statements Constituted Deficient Performance

 

Aldrich next points out that defense counsel made
inaccurate statements and arguments; Aldrich concedes that the statements were
not in and of themselves ineffective assistance but argues that when viewed in
light of counsel=s other deficiencies, these
errors show defense counsel=s
faltering memory and wholesale ineffectiveness.








The record reflects numerous inaccurate
statements by defense counsel.  Counsel
mistakenly recited that Aldrich=s blood
test result was a .17 rather than a .07. 
Another time, defense counsel stated in a hypothetical that the retest
of Aldrich=s blood sample revealed a .40
blood alcohol level rather than a .04. 
Defense counsel frequently forgot the prosecutor=s name
or called the prosecutor by the wrong name. 
Defense counsel referred to Aldrich by the wrong name several times,
referring to Aldrich as Mr. Ingle or Mr. Hudson; defense counsel referred to
witness Terri Wester as Terri Webster and referred to Sergeant Bill Hall as
Bill White and Bill Clark.  During
closing argument, defense counsel referred to Officer Vaughn, a female officer,
as Mr. Vaughn and argued that Vaughn was the officer who administered the field
sobriety tests when it was in fact Officer Slack.  These examples are not exhaustive but merely
a sampling of the inaccurate factual statements made by defense counsel on the
record and that are set forth in Aldrich=s brief.

The prosecutor, in rebuttal, again brought
defense counsel=s conduct into clear focus:

You know, I almost wanted to start with something Danny DeVito said in
AMy Cousin Vinney,@ when he was talking
about his opening statement, but I can=t say that. 
Because, obviously, it seems like Defense Counsel=s memory is not as good
as it should be.  Let me try to tell you
what the facts really were.

First of all, it wasn=t Officer Vaughn who did the field sobriety
test.  It was Officer Slack, right
there.  Officer Vaughn, who=s a female, so it wasn=t Mr. Vaughn.  And by the way, I=m not Mr. DiAngelo.  I=m Mr. Angelino.

 








We hold that defense counsel=s
misstatements of facts and names during Aldrich=s trial
fell below an objective standard of reasonableness.  Such misstatements cannot be part of any
trial strategy.  Consequently, we hold
that this conduct satisfies the first prong of the Strickland test.  

g.     Adducing
Damaging Testimony from Mr. Aldrich Did Not Constitute Deficient Performance

 

Aldrich finally contends that defense counsel was
ineffective by permitting Aldrich to testify during the guilt-innocence phase
and by eliciting damaging and prejudicial testimony from Aldrich.  The record reflectsCin the
bill of exceptions made by AldrichCthat
Aldrich did not intend to testify until approximately one week before trial
when defense counsel claimed that he learned for the first time the identity of
the police officer to whom Aldrich had spoken at the scene and told that he was
blinded by the lights of oncoming traffic. 

Q.  In conference with your lawyers and your
spouse up until you found out aboutCwas the decision made that you were not going to
testify so that you wouldn=t have to give up the fact of your record in theCgettingCand getting into a he
said/she said situation, unless we could find that exculpatoryCunless we knew who it
was, that it was not worth sacrificing to the jury to not know about your
record in return for at least telling your story about it; is that correct?

 

A.  Yes.

 








Q.  When at last you learned from Mr. Angelino
and his informational, I believe it was a fax just a few days before this trial
beganCI thought a few
days.  It might have been a week.  About who it was, and he was at one time even
subpoenaed; you even mentioned in the record, but not what he knew.  There was a team making a different
decision.  Now you were going to testify?

 

A.  Yes. 

 

Thus, the record reflects the reasoning underlying Aldrich=s
decision to testify; defense counsel determined that Aldrich=s
testimonyCthat at the scene he told a
police officer that he did not see the Hudsons because of the glare of oncoming
headlightsCwould be corroborated by
Sergeant Hall.

During Aldrich=s
testimony, defense counsel elicited testimony from him that he had three prior
DWI convictions; he was charged with a fourth which resulted in the revocation
of his parole for the third one.  Defense
counsel did, as pointed out by Aldrich, ask Aldrich some strange and seemingly
prejudicial questions, like on the day of the accident, ADid you
ever takeCsmoke any pot?@  And no factual information was garnered by
Aldrich=s
testimony that was not already before the jury, except his statement that he
could not see the Hudsons.








While in a case of this nature, based on the cold
record before us, it stretches credulity to seriously believe that a Ateam
decision@ that
Aldrich should testify could be part of a reasonable trial strategy, we are
required to give great deference to defense counsel=s
decisions.  As the State points out, the
trial court admonished Aldrich before he testified that the final decision on
whether to testify belonged to him alone. 
And the record reflects that Aldrich understood that if he testified,
his prior criminal record would be revealed; thus, he initially had decided not
to testify.  Apparently Aldrich=s Ateam@ weighed
all of the negatives of Aldrich=s
testifying and, as set forth in the record, determined that the admission of
Aldrich=s
testimony that he could not see the Hudsons along with Sergeant Hall=s
corroborating testimony on this point outweighed the negatives.  Thus, under the deferential standard of
review that we are required to apply, we cannot say that defense counsel=s
conduct in permitting Aldrich to testify and in adducing damaging testimony
from him was without any plausible basis. 
See Ex parte Burns, 601 S.W.2d 370, 372 (Tex. Crim. App. 1980)
(holding error in trial strategy will be considered ineffective assistance of
counsel only if counsel=s actions are without any
plausible basis).  Consequently, we hold
that this particular conduct challenged by Aldrich fails to satisfy the first
prong of the Strickland analysis. 

3.     Conduct During the Punishment Phase of
Trial








Also in his first issue, Aldrich claims that
defense counsel was ineffective at the punishment phase of trial by failing to
object on Confrontation Clause grounds to the improper reading of the victim
impact statements before punishment was assessed and by failing to offer any
argument at punishment at all.  We need
not, however, reach this portion of Aldrich=s first
issue because as discussed below, we will sustain his second issue claiming
that the trial court erred by permitting victim impact statements to be read
before the trial court had assessed punishment.[12]

C.     Second Prong of the Strickland Analysis 








Because we have held that defense counsel=s
pretrial conduct in misunderstanding the law, failing to adequately convey the
plea offer, failing to conduct a reasonable investigation, and failing to
timely obtain and disclose defense experts constituted deficient performance
and that defense counsel=s trial conduct in presenting
defensive theories not supported by the evidence, continuing to misunderstand
the law, failing to properly question witnesses, and his making inaccurate
factual statements constituted deficient performance during the trial on
guilt-innocence, we now address the second prong of the required Strickland
test.  That is, we examine whether there
is a reasonable probability that, but for counsel=s
deficiency, the result of the trial would have been different.  Strickland, 466 U.S. at 687, 104 S.
Ct. at 2064.  The question or Abenchmark@ of our
analysis is whether Aldrich has shown by a preponderance of the evidence that
his defense counsel=s deficiency so compromised the
proper functioning of the adversarial process that the trial court cannot be
said to have produced a reliable result. 
Id. at 686, 104 S. Ct. at 2064; Ex parte Amezquita, 223
S.W.3d at 368.  In analyzing Strickland=s
prejudice prong, we examine counsel=s errors
not as isolated incidents, but in the context of the overall record.  Ex parte Menchaca, 854 S.W.2d 128, 132
(Tex. Crim. App. 1993).  That is, we
consider Awhether those specific deficient
acts or omissions, in their totality, prejudiced the defense.@  Ex parte Nailor, 149 S.W.3d 125, 130
(Tex. Crim. App. 2004).  Thus, we briefly
examine the overall record juxtaposed with the totality of defense counsel=s
specific deficient acts or omissions.








The State called seventeen witnesses, and the
defense called eight.  We have carefully
and repeatedly reviewed the record to place Aldrich=s
allegations of and our determinations of ineffectiveness in the context of the
entire record and the totality of defense counsel=s
representation.  The bulk of defense
counsel=s
cross-examination of the State=s
witnesses focused on eliciting testimony concerning defense counsel=s
defensive theories that the accident was a suicide, assisted suicide, or Mrs.
Hudson=s fault
for failing to yield the right-of-way. 
For example, defense counsel asked Sergeant Hall, A[I]n
your investigation as the senior officer out there, people with long
debilitating injuries, sometimes they commit suicide, don=t they?@  And Sergeant Hall answered, AIn
Texas, the people in the crosswalk have the right-of-way.@  As another example, defense counsel
repeatedly asked whether officers had questioned Mr. Hudson about pushing his
wife in front of an oncoming car.  In
most instances, the trial court sustained the State=s
assuming-facts-not-in-evidence objections.








Defense counsel did make some effective points in
his cross-examination of Kenneth Evans, the drug supervisor at the Department
of Public Safety located in Garland, and excluded a study offered by the State
to show evaporation of alcohol from blood over time on the ground that blood in
the study was stored differently than Aldrich=s blood
was stored.  And, likewise, defense
counsel called Max Courtney to testify as an expert on blood storage and
established that it would not be typical for Aldrich=s blood
alcohol level to degrade from a .07 to a .04, suggesting that perhaps the
initial .07 blood alcohol level was incorrect. 
Defense counsel established that the lights at the scene were
ornamental-type globe lights positioned on fifteen-foot poles and that the
lighting Acould improve.@  Defense counsel elicited testimony that the
Hudsons did not have on any reflective clothing and neither was carrying a
flashlight.  And, finally, defense
counsel called four fact witnesses who were with, or spoke with, Aldrich at
various times throughout the day and early evening prior to the 8:30 p.m.
accident; all testified that he did not appear intoxicated or to have lost the
normal use of his mental or physical faculties.








Despite counsel=s having
been able to raise some legitimate defensive points, the record nevertheless
shows that counsel=s deficient performance resulted
in a trial without a reliable result. 
The overall record reflects that defense counsel=s
deficient performance, as set forth above, was not an isolated incident.  The totality of defense counsel=s errors
pervaded and prejudiced the entire defense, from pretrial conduct in
misunderstanding the law, failing to adequately convey the plea offer, failing
to conduct a reasonable investigation, and failing to timely obtain and
disclose defense experts to trial conduct in presenting defensive theories not
supported by the evidence, continuing to misunderstand the law, failing to
properly question witnesses, and repeatedly making inaccurate factual
statements.  Both the prosecutor and the
trial courtCwho recognized early on that
defense counsel was Aalmost per [se]@
rendering ineffective assistance of counselCattempted
to minimize the impact of defense counsel=s
failings by voluntarily turning over materials to him that he did not ask for,
by instructing him on how to obtain Aldrich=s blood
sample, by dictating the names of the involved police officers to him on the
record at a hearing six months before trial, and by assisting him in other ways
throughout the proceedings.  Aldrich,
however, was entitled to be represented by competent, effective counsel, not to
be forced to rely upon the goodwill and good graces of the fair-minded
prosecutor and the patient trial court. 
The fact that the prosecutor and the trial courtCas
evidenced throughout the recordCfelt
compelled to assist defense counsel based on the perceived almost per se
ineffectiveness of defense counsel establishes that defense counsel Awas not
functioning as the >counsel=
guaranteed the defendant by the Sixth Amendment.@  Strickland, 466 U.S. at 687, 104 S.
Ct. at 2064.








Here, the record before us undisputedly
establishes Athe benchmark for judging any
claim of ineffectiveness,@ that is, that Acounsel=s
conduct so undermined the proper functioning of the adversarial process that
the trial cannot be relied on as having produced a just result.@  Id. at 686, 104 S. Ct. at 2064; Ex
parte Briggs, 187 S.W.3d at 466B67
(granting habeas relief on ineffective assistance of counsel grounds because
defense counsel failed to investigate or obtain experts for economic reasons,
not as trial strategy); Menchaca, 854 S.W.2d at 132B33 (holding
that when defendant=s guilt or innocence turned on
the credibility of the witnesses, counsel rendered ineffective assistance by
failing to file a motion in limine regarding inadmissible prior convictions and
by failing to object when evidence of the convictions was presented); see
also Fuller v. State, 224 S.W.3d 823, 837 (Tex. App.CTexarkana
2007, no pet.) (holding counsel=s
failure to object to inadmissible testimony was, in essence, no strategy and
was ineffective); Walker v. State, 195 S.W.3d 250, 264 (Tex. App.CSan
Antonio 2006, no pet.) (holding numerous deficient acts or omissions by
counsel, in their totality, prejudiced the defense); Hall v. State, 161
S.W.3d 142, 153B54 (Tex. App.CTexarkana
2005, pet. ref=d) (holding counsel was ineffective
by failing to object to admission of extraneous matters); Stone v. State,
17 S.W.3d 348, 353B54 (Tex. App.CCorpus
Christi 2000, pet. ref=d) (holding that defendant was
deprived of a fair trial with a reliable result when counsel elicited evidence
of an inadmissible prior murder conviction, thus diminishing defendant=s
credibility and giving substance to testimony of State=s
witnesses that defendant had threatened to kill them).








We hold that Aldrich has established by a
preponderance of the evidence that the totality of counsel=s
constitutionally deficient performance prejudiced his defense, that defense
counsel=s errors
were so serious that he was not functioning as the >counsel=
guaranteed the defendant by the Sixth Amendment, that defense counsel=s
conduct so undermined the proper functioning of the adversarial process that
the trial cannot be relied on as having produced a just result, and that but
for defense counsel=s performance, the result would
have been different.  We sustain Aldrich=s first
point.

                                 V.  VICTIM IMPACT STATEMENTS

In his second point, Aldrich claims that he is
entitled to a new punishment hearing because the trial court erred by admitting
victim impact statements before he assessed punishment or sentenced
Aldrich.  Aldrich elected to have the
trial court assess his punishment.  After
both sides rested and closed on punishment and after the State=s
closing argument, the State asked to have some unidentified people read unsworn
statements to the trial court.  Defense
counsel questioned the timing of the reading of the statements, stating, AI could
be wrong, but I thought that the sentence was supposed to be invoked, and then
the statements.@ 
The prosecutor responded that the statements were supposed to be read
before sentence was pronounced.  The
trial court permitted an unknown number of unidentified people to read unsworn
statements off the record.

Apparently, as evidenced by the following
exchange, at least some of the statements were critical of, or discussed the
emotional impact of, defense counsel=s
bizarre defensive theories of the case. 
After the statements were read in open court and off the record, the
following exchange occurred:








[DEFENSE COUNSEL]: Judge,
because you have heard this and may consider it in assessing punishment,
mistakenly believing that the suicide belief originated with us, I=d like the opportunity to
address you and the family so they will know that those ideas did not originate
with this defense.

 

[PROSECUTOR]: I
object.  He=s rested.  He=s done everything already.  It=s over.

 

[DEFENSE COUNSEL]: ButC

 

THE
COURT: It=s over, sir.  Anybody else?

 

. . .
. 

 

[DEFENSE
COUNSEL]: May it please the court?

 

THE
COURT: Yes.

 

[DEFENSE COUNSEL]: What I
have to sayCthose personal attacks
would not have been relevant or admissible, couldn=t have [gotten] them into evidence because of the
Court=s rulings.  Things like that were not admissible.  I=d like a chance to explain that before you and if
you say so, then, that=s no.

 

[THE
COURT]: I said no.  It=s done. [Emphasis added.]


 

Article
42.03, section 1(b) provides as follows:

 

(b) The court shall
permit a victim, close relative of a deceased victim, or guardian of a victim,
as defined by Article 56.01 of this code, to appear in person to present to the
court and to the defendant a statement of the person=s views about the
offense, the defendant, and the effect of the offense on the victim.  The victim, relative, or guardian may not
direct questions to the defendant while making the statement.  The court reporter may not transcribe the
statement.  The statement must be made:

 








(1) after
punishment has been assessed and the court has determined whether or not to
grant community supervision in the case;

 

(2) after the
court has announced the terms and conditions of the sentence; and

 

(3) after sentence
is pronounced.

 








Tex. Code Crim. Proc. Ann. art. 42.03, ' 1(b)
(Vernon Supp. 2008) (emphasis added). 
The legislature provided for these statements to be made only after
sentencing to alleviate any risk that the statements would affect the partiality
of the court during the punishment phase of trial.  Johnson v. State, 286 S.W.3d 346, 349
(Tex. Crim. App. 2009); Garcia v. State, 16 S.W.3d 401, 408 (Tex. App.CEl Paso
2000, pet. ref=d) (citing Keith D. Nicholson, Would
You Like More Salt With That Wound? 
Post-Sentence Victim Allocution in Texas, 26 St. Mary=s L.J. 1103,
1114B15
(1995)); see State v. Aguilera, 165 S.W.3d 695, 706 (Tex. Crim. App.
2005) (Keller, P.J., dissenting) (noting same). 
We hold that the trial court erred by allowing such statements to be
made before sentence was pronounced in violation of article 42.03, ' 1(b).  Tex. Code Crim. Proc. Ann. art. 42.03, ' 1(b);
see Gifford v. State, 980 S.W.2d 791, 792B93 (Tex.
App.CHouston
[14th Dist.] 1998, pet. ref=d)
(holding that the trial court should not have allowed the complainant=s father
to make a statement to the court regarding the father=s views
of the offense and the proper punishment before punishment was assessed).

The State argues that nonetheless the trial court
properly allowed the victim impact statements to be read prior to the
assessment of punishment under article 56.03(e) of the code of criminal
procedure.  Article 56.03(e) authorizes
the trial court to consider, before sentencing, the information provided in written
impact statements, made on a form authorized by article 56.03, that the court
has already received.[13]  Tex. Code Crim. Proc. Ann. art. 56.03(e)
(Vernon 2006).  No evidence exists that
the trial court in this case received written victim impact statements that
complied with article 56.03.  Therefore,
article 56.03(e) is not applicable.








Having concluded that the trial court improperly
permitted unidentified persons to read their own statements to the court off
the record prior to the trial court=s
assessment of punishment or pronouncement of sentence, we must conduct a harm
analysis.  Because the error involves a
statutory violation, we treat the error as nonconstitutional for the purpose of
conducting a harm analysis and must disregard it unless it affected Aldrich=s
substantial rights.  Gray v. State,
159 S.W.3d 95, 98 (Tex. Crim. App. 2005); see Tex. R. App. P. 44.2(b).

Ordinarily in conducting this harm analysis, we
consider whether the error had a substantial and injurious effect or influence
in determining the jury=s verdict.  King v. State, 953 S.W.2d 266, 271
(Tex. Crim. App. 1997).  The court of
criminal appeals has held, however, that this test Ais not
helpful in evaluating error in non‑jury proceedings.@  Johnson v. State, 72 S.W.3d 346, 348
(Tex. Crim. App. 2002).  Instead, in
determining whether substantial rights were affected by trial court error in a
nonjury proceeding, we consider whether the defendant had Aa right
to that which the error denied.@  Id.








Because various unidentified witnesses stood and
read their own statements to the trial court prior to the trial court=s
assessment of punishment or pronouncement of sentenceCi.e.,
during the punishment phase of trialCAldrich
had the right to confront and cross-examine them.  Russeau v. State, 171 S.W.3d 871, 880
(Tex. Crim. App. 2005), cert. denied, 548 U.S. 926 (2006); Carroll v.
State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996) (recognizing that
confrontation is the check and balance that ensures fairness in our adversary
system of justice, and cross‑examination is the essential means by which
opponents test evidence proffered against them); cf. Tex. Code Crim.
Proc. Ann. art. 56.03(e) (providing that, before a trial court considers a
written victim impact statement in assessing punishment, the court must give
the accused the opportunity to read and comment on the statement and, with
court approval, to introduce testimony or other information alleging a factual
inaccuracy in the statement).  The trial
court denied Aldrich that right.  We hold
that the trial court=s error in admitting the
off-the-record statements before assessment of punishment and sentencing in
violation of article 42.03, section 1(b) and the trial court=s
refusal to permit Aldrich to respond to or cross-examine these witnesses
affected Aldrich=s substantial rights.  We sustain Aldrich=s second
point.

                                          VI.  CONCLUSION








Having overruled Aldrich=s
seventh point and having sustained his dispositive first and second points, we
reverse the trial court=s judgment and remand this case
for a new trial.[14]  Because we have sustained Aldrich=s first
and second points, we need not address his third through sixth points.  See Tex. R. App. P. 47.1.

 

SUE
WALKER

JUSTICE

 

EN BANC

CAYCE, C.J. filed a dissenting and concurring opinion.

PUBLISH

DELIVERED:  August 25, 2009

 

 

 

 

 











 
 
 
 
 
 
 




 

 

 

 

 

 

                                COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-303-CR

 

 

ALLEN
JOHN ALDRICH                                                         APPELLANT

 

                                                   V.

 

THE
STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

      DISSENTING
AND CONCURRING OPINION ON REHEARING

                                              ------------








I respectfully dissent to the majority=s
holding that Aldrich has established by a preponderance of the evidence that,
but for counsel=s performance, the result would
have been different.  While I agree with
the majority=s holding that counsel=s
performance was deficient, I do not believe the preponderance of the evidence
shows that his conduct so undermined the functioning of the adversarial process
that the trial produced an unjust result. 
I would, therefore, overrule Aldrich=s first
point.  Because I concur with the
majority=s
disposition of the second point, I would reverse the trial court=s
judgment and remand the case to the trial court for a new punishment
trial.  I would affirm the remainder of
the trial court=s judgment.

 

 

JOHN
CAYCE

CHIEF
JUSTICE

 

DELIVERED: August 25,
2009

 

 











[1]Aldrich testified on his
own behalf and denied making this statement to Officer Slack.





[2]At trial, Dr. Angela
Springfield testified for the State that she was not surprised to learn that
the blood alcohol level in the sample had dropped from .07 to .04 during the
fourteen months between when the sample was taken and when it was tested by the
defense because blood samples lose their alcohol content when the sample is not
refrigerated and when the vial containing the sample is opened and closed for
retesting.





[3]At Aldrich=s original trial setting,
the State objected to having any of Aldrich=s experts testifying because the State had not Areceived any notice at
all of any expert being called.@





[4]Defense counsel stated
that Taylor would testify as an expert and Ainterpret the Texas law as to the preferred
directions of headlights on motor vehicles traveling on public roadways in
Texas and how far up the roadway headlights will shine when in the >down= and not >bright= mode.@





[5]During the on-the-record
discussion of whether David Taylor should be permitted to testify, defense
counsel asked the trial court, AWhat did I say that Taylor was?@  The trial court responded, ASorry?@  And defense counsel asked, AWould you tell me what
[kind of expert] I said Taylor was and refresh my memory?@  The trial court did so.





[6]Defense counsel failed to
make an offer of proof regarding either Sullivan=s or Taylor=s proposed testimony.





[7]The State agrees that
defense counsel=s interpretation of Kyles
is Asomewhat expansive,@ but it argues that A[n]one of Aldrich=s claims in this appeal
about his counsel=s alleged
misunderstanding of the law had any effect on the outcome of the trial that the
State can discern.@





[8]At one point, defense
counsel stated, 

 

I will need about four
months after I get all of the exculpatory information to play catch up.  They=ve had a year. 
I=m just asking for four
months and so the State will know that the sooner they get the exculpatory
stuff to meCwhich is out there, I
assure the Court.  If they say they don=t have it, it=s only because they haven=t bothered to follow the
mandates.

 

At another place defense
counsel explained, AI can never be ready in
this case until he does what he=s supposed to do.@ 





[9]The record reflects the
following:

 

[THE PROSECUTOR]: Your Honor, for the record, I=d like it to note that on
January 21st of 2005 at a hearing, Defense Counsel was given the
names of all of the officers.  Page 17
starts at line 22 and continues on, with us even spelling their names, through
line 20 of page 18.





[10]The following are some
examples:  the trial court told defense
counsel that a witness could not hear him and that he needed to speak into the
microphone; the trial court asked defense counsel, AAre you still having
trouble hearing?@; the jury told the
bailiff that they could not hear defense counsel; the trial court later said, AYou=ll need to speak up, the
jurors can=t hear you@; the trial court asked
defense counsel at least three times to speak up because the court could not
hear him; the court reporter said that she could not hear defense counsel;
defense counsel at various points during trial said, AI didn=t hear you,@ AI am having a hard time
hearing,@ AI am just hard of
hearing,@ AI=ve got hearing aids and
they=re playing tricks on me,@ AYour Honor, I just cannot
hear,@  AI didn=t hear what she said,@ AAm I hearing things?@ AI=m deaf, could you speak
up?@ AI can=t hear you,@ AIt=s my hearing, its not
you, I promise,@  and AI am hard of hearing.@  The background noise caused by the air
conditioner apparently exacerbated defense counsel=s difficulties in hearing
and being heard.





[11]For example, the day
trial commenced, defense counsel filed a motion attacking the prosecutor=s credibility and
requesting relief because Athe defense could not have anticipated that the
State would ignore your Orders.@  At one
point during the trial, the frustrated prosecutor said, AYour Honor, I=m going to object, again,
to Defense Counsel basically lying to the Court again.@  At another point during trial, defense
counsel asked Captain Chris Chandler, ADid I tell you for all the good it did me, that a
District Court Judge in this case had issued an order for the D.A.=s to release to me
exculpatory information and nothing had been forthcoming when we talked?@  At another point in the trial, defense
counsel began an objection by telling the trial court judge, AYou know thatBI know that you think
that Mr. Angelino is a wonderful fellow, but . . . .@  The trial court responded in part, AFirst of all, Mr.
Angelino did not ask the question [it was the other prosecutor] . . . .  And, number two, you do not know what I think
about Mr. Angelino.@  At still another point, defense counsel began
a cross-examination question of a State=s witness, AOfficer, you said that under the leading
questions of the Prosecutor that@Cto which the prosecutor lodged a sidebar-comment
objection.  At still another point, in
response to both sides= comments, the trial
court stated, AOkay.  I=ll tell you what. 
I=ll tell everybody this,
and I=ll tell you one at a
time.  I=m not going to let this
trial get out of hand.  I don=t want any sniping back
and forth anymore.  I don=t want any bad-mouthing.@  In closing arguments, defense counsel argued
that A[t]here are many, many
different types of crimes which Mr. DiAngelo, [sic] who described himself as
the one all and be all of the prosecution for DWI cases in Denton County. . . .@ 





[12]A holding that defense
counsel was ineffective during the punishment phase of trial would entitle
Aldrich only to a new punishment hearing, the same relief he claims he is
entitled to in his second point.  See Tex.
Code Crim. Proc. Ann. art. 44.29(b) (Vernon Supp 2008); Hernandez v. State,
988 S.W.2d 770, 772 (Tex. Crim. App. 1999) (holding the two-pronged Strickland
standard applies to alleged counsel=s ineffectiveness at punishment phase of
non-capital trial).  Because all members
of the en banc court agree that Aldrich is entitled to a new punishment hearing
based on his second point and because, as set forth herein, we sustain Aldrich=s second point, we need
not address the punishment phase ineffectiveness claim portion of his first
point.  See Tex. R. App. P. 47.1.





[13]The Texas Crime Victim
Clearinghouse form is sent to victims to collect certain information regarding
the impact of crimes on victims.  See Tex.
Code Crim. Proc. Ann. art. 56.03(b); Fryer v. State, 68 S.W.3d 628, 632
(Tex. Crim. App. 2002); see also Truehitt v. State, 916 S.W.2d 721, 722B23 (Tex. App.CBeaumont 1996, no pet.)
(holding that trial court properly admitted written victim impact statements at
punishment hearing under article 56.03). 
The victim=s personal views about
the offense and the defendant are not admissible before punishment is
assessed.  Compare Tex. Code Crim.
Proc. Ann. art. 42.03, ' 1(b), with id.
art. 56.03(b).





[14]Aldrich asserts that
because we have held that he received ineffective assistance of counsel under
the first Strickland prong in connection with the twenty-year plea
offer, we should order the plea offer reinstated.  When a defendant receives ineffective
assistance of counsel in connection with a plea offer, in order to satisfy the
second Strickland prong, the defendant must establish that but for the
ineffective conduct he would have accepted the plea offer.  See Dickerson v. State, 87 S.W.3d 632,
638 (Tex. App.CSan Antonio 2002, no
pet.); Ex parte Lemke, 13 S.W.3d at 798; State v. Williams, 83
S.W.3d 371, 374B75 (Tex. App.CCorpus Christi 2002, no
pet.); see also Turner v. State, 49 S.W.3d 461, 471 (Tex. App.CFort Worth 2001, pet.
dism=d) (reinstating offer
when counsel failed to communicate offer=s deadline to defendant and defendant attempted
to accept offer after deadline had passed); Paz v. State, 28 S.W.3d 674,
676 (Tex. App.CCorpus Christi 2000, no
pet.) (reinstating offer when counsel failed to inform defendant of offer and
defendant said he would have accepted offer); Atkins v. State, 26 S.W.3d
580, 583 (Tex. App.CBeaumont 2000, pet. ref=d) (same).  Aldrich has not made that showing here.  Accordingly, we decline to order the plea
offer reinstated.